7 F.3d 357
 130 A.L.R.Fed. 633, 62 USLW 2243, Fed.
Sec. L. Rep. P 97,789
 In re DONALD J. TRUMP CASINO SECURITIES LITIGATION--TAJ
MAHAL LITIGATION.
Sidney L. KAUFMAN, suing individually and on behalf of a
class of persons similarly situated; Jerome Schwartz, suing
individually and on behalf of a class of persons similarly
situated; Peter Stuyvesant, Ltd., on behalf of itself and
all others similarly situated; Susan Cagan; Eric Cagan;
David E. Dougherty; Jean Curzio; Alexander L. Charnis;
Dorothy Arkell; Fred Glossner; Herman Krangel; Robert
Kloss; Helen Kloss; Fairmount Financial Corp.; Joanne
Gollomp; Dino Del Zotto
v.
TRUMP'S CASTLE FUNDING; Trump's Castle Associates Limited
Partnership, a New Jersey Limited Partnership; Trump Taj
Mahal Funding, Inc., a New Jersey Corporation; Trump Taj
Mahal Associates Limited Partnership, a New Jersey Limited
Partnership; Donald J. Trump; Robert S. Trump; John
O'Donnell; Nathan Katz; Tim Maland; Francisco Tejeda;
Julian Menarguez; Harvey I. Freeman; Paul Henderson;
Patrick C. McKoy; Edward M. Tracy; Michael S. Vautrin;
Jeffrey A. Ross; John P. Belisle; Timothy G. Rose; Lori
Taylor; C. "Bucky" Willard; The Trump Organization, Inc.;
Trump Taj Mahal, Inc.; Merrill Lynch, Pierce, Fenner &
Smith Incorporated.
Sidney L. KAUFMAN, suing individually and on behalf of a
class of persons similarly situated
v.
TRUMP'S CASTLE FUNDING; Trump's Castle Associates Limited
Partnership, a New Jersey Limited Partnership; Trump Taj
Mahal Funding, Inc., a New Jersey Corporation; Trump Taj
Mahal Associates Limited Partnership, a New Jersey Limited
Partnership; Donald J. Trump.
Jerome SCHWARTZ, suing individually and on behalf of a class
of persons similarly situated
v.
TRUMP'S CASTLE FUNDING, INC. (A New Jersey Corporation);
Trump's Castle Associates Limited Partnership (A New Jersey
Limited Partnership); Trump Taj Mahal Funding, Inc. (A New
Jersey Corporation); Trump Taj Mahal Associates Limited
Partnership (A New Jersey Limited Partnership); Donald J. Trump.
PETER STUYVESANT, LTD., on behalf of itself and all others
similarly situated
v.
Donald J. TRUMP; Robert S. Trump; John O'Donnell; Trump
Plaza Funding, Inc.; Nathan Katz; Tim Maland; Trump Plaza
Associates; Francisco Tejeda; Julian Menarguez; Harvey I.
Freeman; Paul Henderson; Patrick C. McKoy; Edward M.
Tracy; Michael S. Vautrin; Jeffrey A. Ross; John P.
Belisle; Timothy G. Rose; Trump's Castle Funding, Inc.;
Lori Taylor; Trump's Castle Associates Limited Partnership.
Susan CAGAN; Eric Cagan; David E. Dougherty; Jean Curzio
v.
Donald J. TRUMP; Robert S. Trump; Harvey I. Freeman; C.
"Bucky" Willard; Trump Taj Mahal Funding, Inc.; Trump Taj
Mahal Associates Limited Partnership; The Trump
Organization, Inc.; Trump Taj Mahal Incorporated; Merrill
Lynch, Pierce, Fenner & Smith Incorporated.
Alexander L. CHARNIS; Dorothy Arkell
v.
Donald J. TRUMP; Robert S. Trump; Harvey I. Freeman; C.
"Bucky" Willard; Trump Taj Mahal Funding, Inc.; Trump Taj
Mahal Associates Limited Partnership; The Trump
Organization, Inc.; Merrill Lynch, Pierce, Fenner & Smith
Incorporated.
FAIRMONT FINANCIAL CORP.; Joanne Gollomp, on behalf of
themselves and all others similarly situated
v.
Donald J. TRUMP; Harvey S. Freeman; Robert S. Trump; The
Trump Organization, Inc.; Merrill Lynch, Pierce, Fenner &
Smith Incorporated; Trump Taj Mahal Funding, Inc.; Trump
Taj Mahal, Inc.; Trump Taj Mahal Associates Limited Partnership.
Robert KLOSS; Helen Kloss
v.
Donald J. TRUMP; Robert S. Trump; Harvey I. Freeman; C.
"Bucky" Willard; Trump Taj Mahal Associates Limited
Partnership; The Trump Organization, Inc.; Trump Taj
Mahal, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated.
Fred GLOSSNER; Herman Krangel
v.
Donald J. TRUMP; Harvey S. Freeman; Robert S. Trump; The
Trump Organization, Inc.; Merrill Lynch, Pierce, Fenner &
Smith Incorporated; Trump Taj Mahal Funding, Inc.; Trump
Taj Mahal, Inc.; Trump Taj Mahal Associates Limited Partnership.
Dino DEL ZOTTO
v.
Donald J. TRUMP; Robert S. Trump; Harvey I. Freeman; C.
"Bucky" Willard; Trump Taj Mahal Funding, Inc.; Trump
Taj Mahal Associates; The Trump Organization, Inc.;
Trump Taj Mahal, Inc.; Merrill Lynch, Pierce, Fenner &
Smith Incorporated,
Joanne Gollomp, Susan Cagan, Eric Cagan, David E. Dougherty,
Jean Curzio, Robert and Helen Kloss, Fred Glossner, Herman
Krangel, Sidney Kaufman, Jerome Schwartz, Dino Del Zotto,
Alexander L. Charnis and Dorothy Arkell, on behalf of
themselves and all others similarly situated, Appellants.
 No. 92-5350.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 29, 1993.
Decided Oct. 14, 1993.
 
 Stuart D. Wechsler (argued), Joel C. Feffer, New York City, Stanley R. Wolfe, Todd S. Collins, Berger & Montague, P.C., Philadelphia, PA, Carl D. Poplar, Cherry Hill, NJ, Gerald Jay Rodos, Barrack, Rodos & Bacine, Philadelphia, PA, Robert S. Schachter, Zwerling, Schachter & Zwerling, Bruce E. Gerstein, Garwin, Bronzaft, Gerstein & Fisher, New York City, Charles V. Van de Walle, Martin, Van de Walle, Guardino & Donohue, Great Neck, NY, Jared Stamell, Joseph J. Tabacco, Jr., Stamell, Tabacco & Schager, Joseph H. Weiss, New York City, Michael A. Cohan, Cohan & Eckhaus, Parlin, NJ, James V. Bashian, New York City, C. Oliver Burt, III, James R. Malone, Mark C. Rifkin, Debra N. Nathanson, Greenfield & Chimicles, Haverford, PA, Howard A. Specter, Pittsburgh, PA, for appellants.
 Richard L. Posen (argued), Willkie Farr & Gallagher, New York City, John J. Barry, Clapp & Eisenberg, P.C., Newark, NJ, Stuart J. Baskin (argued), Shearman & Sterling, New York City, for appellees.
 Before: BECKER, ALITO, Circuit Judges and ATKINS, District Judge.*OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This is an appeal from orders of the district court for the District of New Jersey dismissing a number of complaints brought under various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 by a class of investors who purchased bonds to provide financing for the acquisition and completion of the Taj Mahal, a lavish casino/hotel on the boardwalk in Atlantic City, New Jersey. The defendants are Donald J. Trump ("Trump"), Robert S. Trump, Harvey S. Freeman, the Trump Organization Inc., Trump Taj Mahal Inc., Taj Mahal Funding Inc. and Trump Taj Mahal Associates Limited Partnership (the "Partnership")[1] (collectively the "Trump defendants") and Merrill Lynch, Pierce, Fenner and Smith Inc. ("Merrill Lynch"). The complaints allege that the prospectus accompanying the issuance of the bonds contained affirmatively misleading statements and materially misleading omissions in contravention of the federal securities laws.
 
 
 2
 The district court dismissed the securities law claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The linchpin of the district court's decision was what has been described as the "bespeaks caution" doctrine, according to which a court may determine that the inclusion of sufficient cautionary statements in a prospectus renders misrepresentations and omissions contained therein nonactionable. While the viability of the bespeaks caution doctrine is an issue of first impression for this court, we believe that it primarily represents new nomenclature rather than substantive change in the law. As we see it, "bespeaks caution" is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law.
 
 
 3
 We believe that the bespeaks caution doctrine is both viable and applicable to the facts of this appeal. The prospectus here took considerable care to convey to potential investors the extreme risks inherent in the venture while simultaneously carefully alerting the investors to a variety of obstacles the Taj Mahal would face, all of which were relevant to a potential investor's decision concerning purchase of the bonds. We conclude that, given these warning signals in the text of the prospectus itself, the plaintiffs cannot establish that a reasonable investor would find the alleged misstatements and omissions material to his or her decision to invest in the Taj Mahal. Hence we will affirm the district court's orders.
 
 
 4
 Inasmuch as some plaintiffs filed their complaints in other districts, and the Judicial Panel on Multidistrict Litigation (the "JPML") transferred them to the district court for the District of New Jersey under 28 U.S.C. § 1407 for consolidated pre-trial proceedings (as opposed to a transfer for all purposes, such as under 28 U.S.C. § 1404(a) or 1406), the question arises whether the district court possessed authority to issue dispositive pre-trial orders terminating the cases so transferred. It seems to be widely accepted that § 1407 and the rules promulgated thereunder empower a transferee court to enter dispositive orders to terminate a case, but there is no reported case law so holding. We take this opportunity to confirm the power of the transferee court to enter a Rule 12(b)(6) dismissal.
 
 I. Facts and Procedural History
 
 5
 In November, 1988 the Trump defendants offered to the public $675 million in first mortgage investment bonds (the "bonds") with Merrill Lynch acting as the sole underwriter. The interest rate on the bonds was 14%, a high rate in comparison to the 9% yield offered on quality corporate bonds at the time. The Trump defendants issued the bonds to raise capital to: (1) purchase the Taj Mahal, a partially-completed casino/hotel located on the boardwalk, from Resorts International, Inc. (which had already invested substantial amounts in its construction); (2) complete construction of the Taj Mahal; and (3) open the Taj Mahal for business.
 
 
 6
 As is well-known, the Taj Mahal was widely touted as Atlantic City's largest and most lavish casino resort. When ultimately opened in April, 1990 it was at least twice the size of any other casino in Atlantic City. It consisted of a 42-story hotel tower that contained approximately 1,250 guest rooms and an adjacent low-rise building encompassing roughly 155,000 square feet of meeting, ballroom and convention space, a 120,000 square foot casino, and numerous restaurants, lounges and stores. The entire structure occupied approximately seventeen acres of land.
 
 
 7
 The prospectus accompanying the bonds estimated the completion cost of the Taj Mahal, including the payment of interest on the bonds for the first fifteen months of operation, at $805 million. It explained that, to obtain that amount, the Trump defendants were relying on the $675 million in bond proceeds, a $75 million capital contribution by Donald Trump, investment income derived from those sums, a contingent additional loan of $25 million from the Trump Line of Credit, and loans from other sources.
 
 
 8
 Plaintiffs ground their lawsuits in the text of the prospectus. Their strongest attack focuses on the "Management Discussion and Analysis" ("MD & A") section of the prospectus, which stated: "The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal)." See Complaint at p 32. The plaintiffs' primary contention is that this statement was materially misleading because the defendants possessed neither a genuine nor a reasonable belief in its truth. However, as the defendants emphasize, the prospectus contained numerous disclaimers and cautionary statements in conjunction with this statement. The cautionary statements stressed, among other things: the intense competition in the casino industry; the absence of an operating history for the Taj Mahal which could serve as a basis for its valuation; the unprecedented size of the Taj Mahal casino in Atlantic City; and the enterprise's potential inability to repay the interest on the bonds in the event of a mortgage default and subsequent liquidation of the Taj Mahal.
 
 
 9
 After learning that the Trump defendants planned to file Chapter 11 bankruptcy proceedings and establish a reorganization plan, various bondholders filed separate complaints in the United States District Courts for the Southern District of New York, the Eastern District of New York and the District of New Jersey. The complaints each alleged that the prospectus accompanying the issuance of the bonds contained material misrepresentations and material omissions in violation of the 1933 and 1934 Acts. Pursuant to 28 U.S.C. § 1407, the JPML subsequently transferred the complaints for consolidated pre-trial proceedings to the District of New Jersey. See MDL Docket No. 864 (In re Donald J. Trump Sec. Litig.).
 
 
 10
 The consolidated complaints pleaded four counts. In count one, the plaintiffs alleged that the prospectus contained misrepresentations and omissions of material fact in violation of §§ 11,[2] 12(2)[3] and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k(a), 77l (2), 77o. Count two of the complaints alleged fraud in the prospectus, based on the same alleged misrepresentations and omissions, but in violation of §§ 10(b)[4] and 20(a)[5] of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10(b)(5)[6] promulgated thereunder, 15 U.S.C. §§ 78j(b), 78t(a), and 17 C.F.R. § 240.10(b)-5. Counts three and four alleged state common law claims.
 
 
 11
 The defendants moved to dismiss the complaints pursuant to Rule 12(b)(6), asserting that the plaintiffs had failed to state actionable securities fraud claims, and also pursuant to Fed.R.Civ.P. 9(b), contending that the plaintiffs failed to plead their fraud allegations with sufficient particularity. The district court granted the defendants' motion under Rule 12(b)(6), reasoning that the abundance of cautionary statements that directly addressed the alleged misrepresentations and omissions rendered the plaintiffs' claims nonactionable as a matter of law. See In re Donald J. Trump Casino Sec. Litig., 793 F.Supp. 543 (D.N.J.1992). The district court also rejected the plaintiffs' motion to amend their complaints to add allegations based on an appraisal of the future value of the Taj Mahal which had been issued by the accounting firm of Laventhol and Horwath ("the Laventhol Report"). The district court did not reach the defendants' motion to dismiss based on Rule 9(b). Having disposed of the federal claims, the court subsequently dismissed the plaintiffs' claims of breach of fiduciary duty and false advertising without prejudice for lack of pendent jurisdiction. 793 F.Supp. at 568. This appeal followed.
 
 
 12
 The district court had jurisdiction over the federal securities law claims under 15 U.S.C. §§ 77v and 78aa and over the state law claims under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the district court's dismissal of the plaintiffs' complaint under Rule 12(b)(6). Marshall-Silver Constr. Co. v. Mendel, 894 F.2d 593, 595 (3d Cir.1990). In this regard, we must accept the plaintiffs' factual allegations as true and give the plaintiffs the benefit of the inferences which we may fairly draw from them. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).
 
 II. The Parties' Contentions
 
 13
 The plaintiffs allege that the prospectus contained material misrepresentations. Their principal claim is that the defendants had neither an honest belief in nor a reasonable basis for one statement in the MD & A section of the prospectus: "The Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal)." Before the district court and again before us, the plaintiffs concentrate on this statement and its allegedly misleading character.
 
 
 14
 The plaintiffs also argue that the prospectus was misleading in its omission of allegedly material information. The plaintiffs submit that the prospectus failed to disclose, inter alia, that: 1) the Taj Mahal required an average "casino win" of approximately $1.3 million per day on a continuing basis in order to service its debtload; 2) Donald Trump had personally guaranteed hundreds of millions of dollars in bank loans for other properties; and 3) the Taj Mahal had an "unprecedented" debt to equity ratio.[7] The plaintiffs contend that these allegedly material misrepresentations and omissions form the basis for actionable securities fraud claims and that, to the extent that the prospectus contained cautionary language, the district court improperly considered the effect of this language on a motion to dismiss.
 
 
 15
 The defendants respond that the myriad warnings and cautionary statements contained in the prospectus sufficiently disclosed to the bondholders the multifarious risks inherent in the investment. With respect to the plaintiffs' primary argument--that the statement relating the Partnership's belief in the Taj Mahal's capacity to generate ample income for the Partnership to make full payment on the bonds was materially misleading--the defendants contend that there was also adequate cautionary language surrounding this statement to render it nonactionable as a matter of law. That is, they insist that when a prospectus (such as this one) contains abundant warnings and cautionary statements which qualify the statements plaintiffs claim they relied upon, plaintiffs cannot, as a matter of law, contend that they were misled by the alleged misrepresentations and/or omissions.
 
 
 16
 III. The District Court's Authority to Terminate the Case
 
 Under 28 U.S.C. § 1407
 
 17
 As we noted above, the JPML transferred a number of complaints that different plaintiffs had filed in the Southern and Eastern Districts of New York to the District of New Jersey for consolidated pre-trial proceedings pursuant to 28 U.S.C. § 1407. At oral argument, the question arose whether the district court possessed the authority to terminate the transferred cases under Rule 12(b)(6). Surprisingly, no judicial precedent addresses this point, so we take this opportunity to make clear that § 1407 empowers transferee courts to enter a dispositive pre-trial order terminating a case.
 
 
 18
 Section 1407 authorizes the consolidation and transfer of civil actions containing common questions of fact "for coordinated or consolidated pretrial proceedings." 28 U.S.C. § 1407(a). The section further directs that the transferee court should remand the case to the transferor court "unless it shall have been previously terminated," which suggests that Congress contemplated that transferee courts would dismiss cases in response to dispositive motions. The dismissal of a complaint under Rule 12(b)(6) constitutes such a pre-trial proceeding.
 
 
 19
 Apparently, transferee courts frequently terminate consolidated cases in practice. See In re Korean Air Lines Disaster, 829 F.2d 1171, 1176 n. 9 (D.C.Cir.1987) (noting that as of 1986 transferee courts had terminated over two-thirds of all cases subject to § 1407 proceedings), aff'd sub nom. Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). Moreover, the practice comports with the rules the JPML promulgated pursuant to § 1407, see Rule 14(a) ("Actions terminated in the transferee district court by valid judgment, including ... judgment of dismissal ..., shall not be remanded ... and shall be dismissed by the transferee district court."), as well as the views of commentators. See Manual for Complex Litigation, Second, § 31.122, at 254 (1985) (stating "[t]he transferee judge has the power to terminate actions by rulings on motions under Fed.R.Civ.P. 12"); Stanley A. Weigel, The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts, 78 F.R.D. 575, 582-83 (1978).
 
 
 20
 In sum, we are satisfied that § 1407 empowered the district court to dismiss the plaintiffs' complaint under Rule 12(b)(6).[8]
 
 
 21
 IV. The Alleged Affirmative Material Misrepresentations in
 
 
 22
 the Prospectus
 
 
 23
 As we explained above, the plaintiffs assert that the Trump defendants had neither an honest nor a reasonable belief in their statement on page 28 of the prospectus that "[t]he Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal)." The plaintiffs contend that, in view of this allegation, they have stated a cause of action under the federal securities laws. We disagree.[9]
 
 A. General Legal Principles
 
 24
 At a minimum, each of the securities fraud provisions which the bondholders allege the Trump defendants violated requires proof that the defendants made untrue or misleading statements or omissions of material fact. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280, 286 (3d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).[10] We have squarely held that opinions, predictions and other forward-looking statements are not per se inactionable under the securities laws. Rather, such statements of "soft information" may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them.[11] See, e.g., Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 184 (3d Cir.1988), cert. denied, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989); Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied sub nom. Wasserstrom v. Eisenberg, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). Therefore, the plaintiffs' complaint does not falter just because it alleges that the defendants made a misrepresentation with their statement that they believed they would be able to repay the principal and interest on the bonds. Rather, the complaint cannot survive a motion to dismiss because ultimately it does not sufficiently allege that the defendants made a material misrepresentation.
 
 
 25
 The Supreme Court in TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), defined materiality within the proxy-solicitation context of § 14(a) of the 1934 Act. Subsequently the Court expressly made the TSC standard applicable to actions under § 10 and Rule 10b-5, see Basic Inc. v. Levinson, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), and we have made it applicable as well to claims under §§ 11 and 12(2) of the 1933 Act, see Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 641 & n. 18 (3d Cir.1989). TSC instructs that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [act]." 426 U.S. at 449, 96 S.Ct. at 2132. For an omission to be deemed material, "there must be a substantial likelihood that [its disclosure] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id.[12]
 
 
 26
 As the statement quoted immediately above implies, materiality is a relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it. See I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir.1991).[13] In other words, a particular misrepresentation or omission significant to a reasonable investor in one document or circumstance may not influence a reasonable investor in another. We accordingly take into account not only the assertion that the Partnership believed the Taj Mahal could meet the obligations of the bonds, but also other relevant statements contained in the prospectus.
 
 B. The Text of the Prospectus
 
 27
 The prospectus at issue contained an abundance of warnings and cautionary language which bore directly on the prospective financial success of the Taj Mahal and on the Partnership's ability to repay the bonds. We believe that given this extensive yet specific cautionary language, a reasonable factfinder could not conclude that the inclusion of the statement "[t]he Partnership believes that funds generated from the operation of the Taj Mahal will be sufficient to cover all of its debt service (interest and principal)" would influence a reasonable investor's investment decision. More specifically, we believe that due to the disclaimers and warnings the prospectus contains, no reasonable investor could believe anything but that the Taj Mahal bonds represented a rather risky, speculative investment which might yield a high rate of return, but which alternatively might result in no return or even a loss. We hold that under this set of facts, the bondholders cannot prove that the alleged misrepresentation was material.
 
 
 28
 The statement the plaintiffs assail as misleading is contained in the MD & A section of the prospectus, which follows the sizable "Special Considerations" section, a section notable for its extensive and detailed disclaimers and cautionary statements. More precisely, the prospectus explained that, because of its status as a new venture of unprecedented size and scale, a variety of risks inhered in the Taj Mahal which could affect the Partnership's ability to repay the bondholders. For example, it stated:
 
 
 29
 The casino business in Atlantic City, New Jersey has a seasonal nature of which summer is the peak season.... Since the third interest payment date on the Bonds [ (which constitutes the first interest payment not paid out of the initial financing) ] occurs before the summer season, the Partnership will not have the benefit of receiving peak season cash flow prior to the third interest payment date, which could adversely affect its ability to pay interest on the Bonds.
 
 
 30
 ... The Taj Mahal has not been completed and, accordingly, has no operating history. The Partnership, therefore, has no history of earnings and its operations will be subject to all of the risks inherent in the establishment of a new business enterprise. Accordingly, the ability of the Partnership to service its debt to [Taj Mahal Funding Inc., which issued the bonds,] is completely dependent upon the success of that operation and such success will depend upon financial, business, competitive, regulatory and other factors affecting the Taj Mahal and the casino industry in general as well as prevailing economic conditions....
 
 
 31
 The Taj Mahal will be the largest casino/hotel complex in Atlantic City, with approximately twice the room capacity and casino space of many of the existing casino/hotels in Atlantic City. [No] other casino/hotel operator has had experience operating a complex the size of the Taj Mahal in Atlantic City. Consequently, no assurance can be given that, once opened, the Taj Mahal will be profitable or that it will generate cash flow sufficient to provide for the payment of the debt service....
 
 
 32
 Prospectus at 8.
 
 
 33
 The prospectus went on to relate, as part of its "Security for the Bonds" subsection, the potential effect of the Partnership's default on its mortgage payments. For example, this subsection unreservedly explained that if a default occurred prior to completion of the Taj Mahal, "there would not be sufficient proceeds [from a foreclosure sale of the Taj Mahal] to pay the principal of, and accrued interest on, the Bonds." Prospectus at 9.
 
 
 34
 The "Special Considerations" section also detailed the high level of competition for customers the completed Taj Mahal would face once opened to the public:
 
 
 35
 Competition in the Atlantic City casino/hotel market is intense. At present, there are twelve casino/hotels in Atlantic City.... Some Atlantic City casino/hotels recently have completed renovations or are in the process of expanding and improving their facilities.... The Partnership believes that, based upon historical trends, casino win per square foot of casino space will decline in 1990 as a result of a projected increase in casino floor space, including the opening of the Taj Mahal.
 
 
 36
 Prospectus at 14 (emphasis added). In a section following the MD & A section, the prospectus reiterated its reference to the intense competition in the Atlantic City casino industry:
 
 
 37
 Growth in Atlantic City casino win is expected to be restrained until further improvements to the City's transportation system and infrastructure are undertaken and completed and the number of non-casino hotel rooms and existing convention space are increased. No assurance can be given with respect to either the future growth of the Atlantic City gaming market or the ability of the Taj Mahal to attract a representative share of that market.
 
 
 38
 Prospectus at 33. The prospectus additionally reported that there were risks of delay in the construction of the Taj Mahal and a risk that the casino might not receive the numerous essential licenses and permits from the state regulatory authorities. See Prospectus at 11-13, 15-16, 35-37.
 
 
 39
 In this case the Partnership did not bury the warnings about risks amidst the bulk of the prospectus. Indeed, it was the allegedly misleading statement which was buried amidst the cautionary language. At all events, in addition to reading the allegedly misleading statement setting forth the Partnership's belief that it could repay the principal and interest on the bonds, a prospective investor would have also read the dire warnings and cautionary statements a sampling of which we have just outlined. Moreover, an investor would have read the sentence immediately following the challenged statement, which cautioned: "[n]o assurance can be given, however, that actual operating results will meet the Partnership's expectations."
 
 
 40
 As we explained above, we must consider an alleged misrepresentation within the context in which the speaker communicated it. Here the context clearly and precisely relayed to the bondholders the substantial uncertainties inherent in the completion and operation of the Taj Mahal. The prospectus contained both general warnings that the Partnership could not assure the repayment of the bonds as well as specific discussions detailing a variety of risk factors that rendered the completion and profitable operation of the Taj Mahal highly uncertain. Within this broad context the statement at issue was, at worst, harmless.
 
 C. The Bespeaks Caution Doctrine
 
 41
 The district court applied what has come to be known as the "bespeaks caution" doctrine. In so doing it followed the lead of a number of courts of appeals which have dismissed securities fraud claims under Rule 12(b)(6) because cautionary language in the offering document negated the materiality of an alleged misrepresentation or omission. See Sinay v. Lamson & Sessions Co., 948 F.2d 1037, 1040 (6th Cir.1991); I. Meyer Pincus & Assocs. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir.1991); Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir.1991); Polin v. Conductron Corp., 552 F.2d 797, 806 n. 28 (8th Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); cf. Huddleston v. Herman & MacLean, 640 F.2d 534, 543-44 (5th Cir.1981) (holding that a general warning was insufficient to render a known misrepresentation immaterial as a matter of law), modified, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); see also In re Convergent Technologies Sec. Litig., 948 F.2d 507, 515-16 (9th Cir.1991) (applying but not explicitly referencing the bespeaks caution doctrine to uphold a grant of summary judgment for the defendant). We are persuaded by the ratio decidendi of these cases and will apply bespeaks caution to the facts before us.
 
 
 42
 The application of bespeaks caution depends on the specific text of the offering document or other communication at issue, i.e., courts must assess the communication on a case-by-case basis. See Flynn v. Bass Bros. Enters., 744 F.2d 978, 988 (3d Cir.1984) (holding courts must determine the materiality of soft information on a case-by-case basis). Nevertheless, we can state as a general matter that, when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.
 
 
 43
 The bespeaks caution doctrine is, as an analytical matter, equally applicable to allegations of both affirmative misrepresentations and omissions concerning soft information. Whether the plaintiffs allege a document contains an affirmative prediction/opinion which is misleading or fails to include a forecast or prediction which failure is misleading, the cautionary statements included in the document may render the challenged predictive statements or opinions immaterial as a matter of law. Of course, a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.
 
 
 44
 Because of the abundant and meaningful cautionary language contained in the prospectus, we hold that the plaintiffs have failed to state an actionable claim regarding the statement that the Partnership believed it could repay the bonds. We can say that the prospectus here truly bespeaks caution because, not only does the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly address the substance of the statement the plaintiffs challenge. That is to say, the cautionary statements were tailored precisely to address the uncertainty concerning the Partnership's prospective ability to repay the bondholders.
 
 
 45
 Moreover, contrary to the submission of the plaintiffs, the Supreme Court's reasoning in Virginia Bankshares, Inc. v. Sandberg, --- U.S. ----, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) supports rather than undermines the application of the bespeaks caution doctrine in this case. In Virginia Bankshares, the Court considered the actionability of statements of reasons, opinions or beliefs in the proxy-solicitation context under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a).[14] The Court rejected the defendants' argument that a statement by corporate directors, made in the midst of an effort to effectuate a "freeze-out" merger, that in their opinion $42 a share was a fair price which would offer "high" value to the minority stockholders, was inactionable under the securities laws. Consistent with our decisions pre-dating Virginia Bankshares, see, e.g., Eisenberg v. Gagnon, 766 F.2d at 776, the Court held that statements of opinion or belief may be actionable when they expressly or impliedly assert something false or misleading about their subject matter. The Court further held that the specific statement at issue in the case was a proper basis for liability under § 14(a) because the minority shareholders reasonably understood it to rest on a factual basis. See --- U.S. at ----, 111 S.Ct. at 2758-60.
 
 
 46
 In addition, the Court in Virginia Bankshares reached two conclusions directly relevant to the case at bar. First, the Court held that a speaker's subjective disbelief or motivation, standing alone, would be inadequate to state a claim under § 14(a).[15] Second, and more importantly, by recognizing that an accompanying statement may neutralize the effect of a misleading statement, the Court impliedly accepted the logic of the bespeaks caution doctrine. Id. at ----, 111 S.Ct. at 2760. The Court explained:
 
 
 47
 While a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil. Since liability under § 14(a) must rest not only on deceptiveness but materiality as well[,] ... publishing accurate facts in a proxy statement can render a misleading statement too unimportant to ground liability.
 
 
 48
 Id.
 
 
 49
 The Court then refined this general principle to take on the same contours as what we have denoted as the bespeaks caution doctrine. In particular, the Court acknowledged that "not every mixture with the true will neutralize the deceptive. If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow." Id. at ----, 111 S.Ct. at 2760. In fact, this notion really comports with the general principle, because it merely underscores that when the subject of a misrepresentation or omission is such that the accompanying language does not diminish the importance of the misrepresentation or omission to the investor, the misrepresentation or omission remains actionable. In a word, a misrepresentation or omission is actionable when materially misleading.
 
 
 50
 This reading of Virginia Bankshares just restates what what we explained above, namely, that materiality involves a context-specific analysis such that warnings and cautionary language will sometimes suffice to render the allegedly misleading misrepresentations or omissions immaterial as a matter of law. We understand Virginia Bankshares to indicate that if the nature of the subject matter or the manner of presentation of an alleged misrepresentation or omission or its accompanying statements is such that for a reasonable investor the accompanying statements do not offset the misleading effect of the misrepresentation or omission, then bespeaks caution is unavailable as a defense. Therefore, contrary to the plaintiffs' assertion, we believe that our analysis comports with the Supreme Court's reasoning in Virginia Bankshares.[16]
 
 D. Conclusion
 
 51
 Returning to the instant case, we think it clear that the accompanying warnings and cautionary language served to negate any potentially misleading effect that the prospectus' statement about the Partnership's belief in its ability to repay the bonds would have on a reasonable investor. The prospectus clearly and precisely cautioned that the bonds represented an exceptionally risky, perhaps even speculative, venture and that the Partnership's ability to repay the bonds was uncertain. Given this context, we believe that no reasonable jury could conclude that the subject projection materially influenced a reasonable investor.[17]V. The Allegations Concerning Material Omissions
 
 
 52
 The complaint also includes allegations that the prospectus omitted material facts. More specifically, the plaintiffs contend that the prospectus was materially misleading due to its failure to disclose certain facts which, for purposes of this appeal, we assume are all true: 1) the precarious nature of Trump's personal finances; 2) the fact that the Taj Mahal would require an average daily casino win of $1.3 million in order to repay the bonds in full; 3) the thinly-capitalized nature of the Taj Mahal; 4) the expense necessary to attract customers from other casinos to the Taj Mahal and the improbability that the Taj Mahal would be successful in such an effort; and 5) the likely effect of the already weakened economy on the future success of the Taj Mahal. Analyzing each in turn, we reject the plaintiffs' contention that these allegations state actionable securities fraud claims.
 
 A. Trump's Personal Finances
 
 53
 We can readily dispose of the plaintiffs' allegation that the prospectus made a material omission in its failure to disclose that Trump's financial condition was "precarious" because he had made or was planning to make various financial guarantees on projects unrelated to the Taj Mahal. Complaint at p 34.[18] The prospectus made clear that Trump was only obligated to contribute $75 million of his own funds toward the completion of the Taj Mahal and that he had promised to lend the venture up to $25 million under specified circumstances. It did not even suggest that Trump would contribute more of his personal wealth to the venture in order to repay the bondholders or otherwise to ensure the Taj Mahal's successful completion and operation. Given the explicit limitations on Trump's financial obligations toward the Taj Mahal as well as the fact that he, in fact, contributed the amounts he had promised, we fail to see the materiality of his actions or intentions with respect to the balance of his personal assets.[19]
 
 B. Average Daily Casino Win
 
 54
 We also reject the plaintiffs' argument that they state an actionable claim through their allegation that the prospectus failed to disclose that, for the Partnership to repay all of its debts, the Taj Mahal would require a $1.3 million average daily casino win. See Complaint at p 33(a)-(b). As we discussed above, the prospectus went to great lengths to alert investors to many of the specific risks involved in the successful completion and operation of the Taj Mahal. It clearly conveyed the projected magnitude and enormity of the casino/hotel--the size of which was unprecedented in Atlantic City--and acknowledged that consequently the Taj Mahal's projected cash flow and profitability were highly uncertain. In addition, the prospectus directly related this uncertainty to the indefiniteness of the Partnership's ability to repay the bonds. With great detail, it also explained the intense competition the Taj Mahal would face in Atlantic City. The prospectus even predicted that, due to the projected increase in casino floor space, the average casino win per square foot would decrease in Atlantic City.
 
 
 55
 A reasonable investor, having read these cautionary explanations, would understand that the Taj Mahal carried substantial risks. He or she would further comprehend that, because of its size, the Taj Mahal would need to generate a particularly high daily casino win. In other words, an explicit statement in the prospectus that the Taj Mahal demanded an average daily casino win of $1.3 million to meet its debtload would have been superfluous. We therefore hold as a matter of law that this omission was immaterial and cannot form the basis for a claim under the federal securities laws.
 
 C. Debt/Equity Ratio
 
 56
 The plaintiffs furthermore allege that the prospectus failed to disclose that the construction and operation of the Taj Mahal "involved an excessive, unwarranted, and unprecedented debt component relative to total capitalization. Out of the $805 million total projected ... costs, no more than $75 million (or only nine percent) represented capital contributions." Complaint at p 36.
 
 
 57
 The plaintiffs cannot successfully contend that the prospectus failed to disclose the specifics of the debt-equity ratio. The prospectus set forth the details of the venture's projected debt component with great clarity. It advised that the Partnership estimated a cost of approximately $805 million to fund the acquisition, completion and operation of the Taj Mahal and to repay the interest on the bonds for fifteen months. It then specifically delineated the several sources for this amount and the magnitude of each source.[20] Thus the prospectus adequately apprised the bondholders that capital contributions (rather than debt obligations) would supply only about nine percent of the Taj Mahal's funds.
 
 
 58
 In addition, the plaintiffs cannot successfully contend that the prospectus is actionable because it failed to describe its debt-equity ratio as either "unwarranted" or "excessive." See Goldberg v. Meridor, 567 F.2d 209, 218 n. 8 (2d Cir.1977) ("We do not mean to suggest that § 10(b) or Rule 10b-5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives."), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). The prospectus disclosed the relevant fact that capital contributions would provide only $75 million of the $805 million budget. And even assuming the Partnership had superior access to such information, the prospectus' failure to compare the Taj Mahal's debt-equity ratio with that of other casinos does not, by itself, create an actionable claim.
 
 
 59
 The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably, for at least three reasons. First, such a requirement would impose an onerous if not insurmountable obstacle on issuers of securities to ensure they obtain accurate information on all aspects of their competitors which a reasonable investor might find material. Second, were we to announce such a requirement, the likely result would be to inundate the investor with what the Supreme Court disparaged as "an avalanche of trivial information." TSC, 426 U.S. at 448, 96 S.Ct. at 2132. Third--and of greatest consequence--it is precisely and uniquely the function of the prudent investor, not the issuer of securities, to make such comparisons among investments. See In re Donald J. Trump Sec. Litig., 793 F.Supp. at 559.
 
 
 60
 Similarly, to the extent that the plaintiffs simply challenge the Partnership's decision to obtain only $75 million in capital contributions in comparison to the approximately $700 million in debt obligations, they plainly do not state a claim under the securities laws. It is well-established that the securities laws do not create liability for breaches of fiduciary duty or mismanagement. See Santa Fe Indus. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). We have held that "[w]here the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." Craftmatic, 890 F.2d at 640. Accordingly, we hold that the plaintiffs' challenges with respect to the Taj Mahal's debt-equity ratio fail as a matter of law to state a claim under the federal securities laws.
 
 D. Attracting Customers from Other Casinos
 
 61
 The plaintiffs also allege that the prospectus failed to disclose that the Taj Mahal would be unlikely to draw away enough customers from other casinos to generate sufficient income for the Partnership to repay its debts. Because the prospectus did in fact warn of the high level of competition for patrons that the Taj Mahal would face, we uphold the district court's decision to dismiss these claims.[21]
 
 
 62
 The prospectus explicitly stressed the severity of competition the Taj Mahal would face. It twice stated that "[c]ompetition in the Atlantic City casino/hotel market is intense." In addition, the prospectus specified with particularity the number of casinos in Atlantic City which would compete with the Taj Mahal, and their operators' ongoing and projected efforts to expand their capacity and/or renovate their facilities. The prospectus disclosed that the "Atlantic City casino industry is currently experiencing a significant increase in capacity." It warned that "[t]he Partnership believes that, based upon historical trends, casino win per square foot of casino space will decline in 1990 as a result of a projected increase in casino floor space, including the opening of the Taj Mahal."
 
 
 63
 The prospectus, moreover, stated flatly: "Growth in Atlantic City casino win is expected to be restrained.... No assurance can be given with respect to either the future growth of the Atlantic City gaming market or the ability of the Taj Mahal to attract a representative share of that market." Furthermore, the prospectus underscored that the Taj Mahal would compete with other Trump-owned casinos in Atlantic City and with other forms of legalized gambling in the vicinity as well as casino and other gambling in other regions (e.g., Las Vegas). In short, the prospectus extensively and graphically disclosed the magnitude of the competition that the Taj Mahal would face.
 
 
 64
 The prospectus so bespoke caution with respect to the Taj Mahal's prospective competitive obstacles that we deem the challenged omission immaterial as a matter of law. Because the prospectus took substantial pains to convey to the bondholders the considerable competition that the Taj Mahal would face in the Atlantic City casino industry, we fail to see how the inclusion of the prediction that the Taj Mahal would have difficulty in surmounting this obstacle successfully would have materially altered the substance of the information provided by the prospectus. Cf. Craftmatic, 890 F.2d at 641-44 (dismissing complaint's allegations of material omissions of predictive statements about the likely success of the defendant's effort to enter new lines of business). We therefore conclude that the prospectus adequately cautioned potential investors that the Taj Mahal would face intense competition. These warnings undermine any claim that the prospectus made material omissions on this issue.
 
 E. Economic Conditions
 
 65
 Finally we turn to the plaintiffs' allegation that the prospectus "omitted to disclose the likely effect of the already weakened economy in the Northeast and the potential for competition from casinos located in Las Vegas, Nevada." Complaint at p 39. This allegation also fails to state an actionable claim. As mentioned above, see supra page 376, the prospectus did in fact divulge that the Taj Mahal would face competition from Las Vegas casinos. In addition, we hold that the defendants did not violate the securities fraud laws merely by failing to alert investors to the obvious implications of the already weakened economic conditions in the Northeast. As the reasonable investor should have known of the economic downturn in the Northeast at that time, the inclusion of this information would not have substantively altered the total mix of information the prospectus provided to investors. The federal securities laws, in a word, do not compel the Partnership to state the obvious.
 
 VI. Conclusion
 
 66
 For the foregoing reasons we will affirm the orders of the district court dismissing the plaintiffs' complaints under Rule 12(b)(6). In view of our disposition of the plaintiffs' federal causes of action, we will also affirm the district court's dismissal without prejudice of the plaintiffs' state law claims for lack of pendent jurisdiction.
 
 
 
 *
 The Honorable C. Clyde Atkins, United States District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 The Partnership was composed of Trump and Trump Taj Mahal Inc. as the general partners and Trump as the sole limited partner. Taj Mahal Funding Inc., which actually issued the bonds, immediately loaned the proceeds to the Partnership
 
 
 [2]
 Section 11(a) provides in pertinent part:
 In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may ... sue--
 (1) every person who signed the registration statement;
 (2) every person who was a director of ... or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted:
 (5) every underwriter with respect to such security.
 15 U.S.C. § 77k(a).
 
 
 [3]
 Section 12(2) establishes the liability of any seller or offeror of a security who:
 by means of a prospectus or oral communication ... includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission....
 15 U.S.C. § 77l(2).
 
 
 [4]
 Section 10(b) provides in pertinent part:
 It shall be unlawful for any person, directly or indirectly ...
 (b) [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j(b).
 
 
 [5]
 Section 15 of the Securities Act of 1933 and § 20(a) of the Securities Exchange Act of 1934 establish liability for those "controlling persons" who violate the substantive provisions of the respective acts. See 15 U.S.C. §§ 77o, 78t(a)
 
 
 [6]
 Rule 10b-5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality ...
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. § 240.10b-5
 
 
 [7]
 As we noted above, the district court denied the plaintiffs' motion to amend their complaint to add allegations that the prospectus did not disclose the existence of the Laventhol Report and the substance of its conclusions. The plaintiffs have been equivocal, however, as to whether they challenge the district court's denial of their motion to amend here. They did not raise the denial of their motion to amend in their statement of the issues. Moreover, they expressly stated in their opening brief that they did not wish to challenge this portion of the district court's order: "Plaintiffs asked the [district court] to consider the Laventhol Report.... The district court declined to do so ... and plaintiffs do not challenge that decision here.... Plaintiffs do not now ask this Court to consider the prescience of the Laventhol Report or to consider the omission of any mention of this report from the Prospectus." Brief for Appellants at 10-11 n. 8 (emphasis added). Nevertheless, in their reply brief and at oral argument plaintiffs advanced arguments premised on the Laventhol Report. It is well-established that, "[a]s a general matter, the courts of appeals will not consider arguments raised on appeal for the first time in a reply brief." Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 205 n. 29 (3d Cir.1990); accord International Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1327 n. 11 (3d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1588, 123 L.Ed.2d 154 (1993). Under these circumstances, then, we will not reach the merits of this issue
 
 
 [8]
 The transfer of the complaints filed in the Southern and Eastern Districts of New York to the District of New Jersey presents a potential choice of law issue in terms of whether Second or Third Circuit precedent controls. The district court followed the approach the D.C. Circuit adopted in the leading case on choice of law in multidistrict transfers, see In re Korean Air Lines Disaster, 829 F.2d at 1176. Consequently, the district court held that while only this court's precedent would control, the Second Circuit's precedent would merit close consideration. See In re Donald J. Trump Sec. Litig., 793 F.Supp. at 548. Because neither party has challenged the district court's holding on this point, we assume without deciding that it was correct
 
 
 [9]
 Although the plaintiffs did not attach the prospectus to their complaint, the defendants appended it to their motion to dismiss. We recently held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993). Because the complaint directly challenged the prospectus, the district court properly considered the prospectus in deciding whether to grant the Rule 12(b)(6) motion
 
 
 [10]
 There are substantial differences between the elements a plaintiff must establish under § 10 and Rule 10b-5 of the Securities Exchange Act of 1934 and under §§ 11 and 12(2) of the Securities Act of 1933. See Herman & MacLean v. Huddleston, 459 U.S. 375, 380-86, 103 S.Ct. 683, 686-89, 74 L.Ed.2d 548 (1983). Under the former, the plaintiffs must plead not only that the defendants made material omissions and/or misrepresentations, but also that they reasonably relied on them and that the defendants acted with knowledge or recklessness. See id. at 382, 103 S.Ct. at 687; Shapiro, 964 F.2d at 280. In contrast, §§ 11 and 12(2) impose no such requirements. See Herman & MacLean, 459 U.S. at 383-84, 103 S.Ct. at 688; Shapiro, 964 F.2d at 286. Because our analysis here is predicated on the materiality requirement, which is common to all the causes of action the plaintiffs allege, we do not here distinguish between the various securities law provisions that the plaintiffs invoke
 
 
 [11]
 "The term soft information refers to statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir.1989). See generally Victor Brudney, A Note on Materiality and Soft Information Under the Federal Securities Laws, 75 Va.L.Rev. 723 (1989)
 
 
 [12]
 In TSC the Court also indicated that setting the threshold for materiality too low would not serve the remedial purposes of the securities laws:
 Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good.... [I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but [it] also ... may cause [management] to bury the shareholders in an avalanche of trivial information--a result that is hardly conducive to informed decisionmaking.
 426 U.S. at 448-49, 96 S.Ct. at 2132.
 
 
 [13]
 Although materiality is a mixed question of law and fact which the trier of fact ordinarily decides, see TSC, 426 U.S. at 450, 96 S.Ct. at 2132-33; Shapiro, 964 F.2d at 280 n. 11, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law." Shapiro, 964 F.2d at 280 & n. 11; accord TSC, 426 U.S. at 450, 96 S.Ct. at 2133; Craftmatic, 890 F.2d at 641
 
 
 [14]
 Although the Court in Virginia Bankshares addressed § 14(a) of the 1934 Act, which concerns proxy statements, it is instructive here in addressing the plaintiffs' claims brought under §§ 11 and 12(2) of the 1933 Act, §§ 10 and 20 of the 1934 Act and Rule 10b-5 promulgated thereunder, which involve corporate communications in the sale of securities. Cf. Basic Inc. v. Levinson, 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (adopting the materiality standard under § 14 for § 10 and Rule 10b-5)
 
 
 [15]
 The Court stated: "We think that proof of mere disbelief or belief undisclosed should not suffice for liability under § 14(a), and if nothing more had been required or proven in this case we would reverse [the judgment in favor of the plaintiff] for that reason." Virginia Bankshares, --- U.S. at ----, 111 S.Ct. at 2760
 
 
 [16]
 In Mayer v. Mylod, 988 F.2d 635 (6th Cir.1993) the Sixth Circuit clarified and narrowed its decision in Sinay v. Lamson & Sessions Co., 948 F.2d 1037 (6th Cir.1991), which appeared to apply the bespeaks caution doctrine liberally, to eliminate any potential conflict with Virginia Bankshares. Contrary to the plaintiffs' argument, the interpretation of Virginia Bankshares in Mayer is consistent with ours
 In Sinay, the Sixth Circuit had held, apparently without reservation, that "[e]conomic projections are not actionable if they bespeak caution." 948 F.2d at 1040. In considering this broad statement in Mayer, the Sixth Circuit acknowledged its potential tension with the Supreme Court's recognition in Virginia Bankshares that, although the effect of some misrepresentations will be negated by the inclusion of other statements, "not every mixture with the true will neutralize the deceptive." Virginia Bankshares, --- U.S. at ----, 111 S.Ct. at 2760 (emphasis added), quoted in Mayer, 988 F.2d at 639. The Mayer court thus properly recognized that in light of Virginia Bankshares its earlier statement, which one could have read to indicate that economic projections coupled with warnings and cautionary statements are per se non-actionable, was overbroad. Because we do not establish a sweeping rule that cautionary statements will always render misrepresentations or omissions immaterial as a matter of law, we believe that the Mayer court's understanding of Virginia Bankshares is harmonious with our approach here.
 
 
 [17]
 The plaintiffs have also alleged that the prospectus was materially misleading in its estimation that as of its opening date the Taj Mahal would be worth approximately $1.1 billion. An independent appraisal conducted by the Appraisal Group International ("AGI") had arrived at that estimate. The plaintiffs submit that this estimate lacked an adequate basis in fact because AGI based it on " 'the capitalization of income approach,' even though at the time of the Prospectus it was impossible to make any reasonable estimate of the Taj Mahal's future income." Complaint at p 37
 We conclude that, given the text of the prospectus, the plaintiffs have failed to state a claim under the securities laws through this allegation. As we discussed more fully above, see supra Part IV.B, the prospectus explicitly disclosed that the Taj Mahal, as a new enterprise, lacked any operating history, including any history of earnings. Moreover, the prospectus clearly and precisely set forth the speculative nature of this estimate and the consequent uncertainty that the Taj Mahal would actually be worth $1.1 billion by its opening date. This cautionary discussion, in combination with the more general warnings which alerted investors to the variety of highly uncertain circumstances the Taj Mahal confronted, rendered the estimate of the Taj Mahal's worth on its opening date immaterial.
 We further note that the plaintiffs' allegation concerning the appraisal report fails to satisfy the particularity requirements of Rule 9(b), which at least applies to the plaintiffs' claims brought under § 10 and Rule 10b-5. See Shapiro v. UJB Fin. Corp., 964 F.2d at 288 (leaving open the question whether Rule 9(b) always applies to claims brought under §§ 11 and 12(2) even when they sound in negligence rather than fraud). The complaint fails to allege (i) what established appraisal method the AGI Report should have used, (ii) how the capitalization of income approach departed from that method, and (iii) that the defendants recognized or should have recognized the unreasonableness of the capitalization of income approach as an estimate of the future value of the Taj Mahal. See Christidis v. First Pa. Mortgage Trust, 717 F.2d 96, 100 (3d Cir.1983) (holding that a complaint with similar deficiencies failed to comply with Rule 9(b)).
 
 
 [18]
 The plaintiffs also alleged that Trump himself made misleading statements and failed to make material disclosures when he, in speaking with the press, denied that he was having financial troubles and boasted about his financial strength and the liquidity of his assets. See Complaint at p 41. Our analysis with respect to the similar alleged omissions in the prospectus equally applies to the allegations concerning these statements
 
 
 [19]
 The prospectus stated that Trump "has advised the Partnership ... that he has sufficient financial resources to perform his obligations.... He has further advised ... that his net worth, determined in accordance with generally accepted accounting principles ..., is at least $500,000,000." If this account accurately portrayed Trump's personal finances, then even after subtracting the amounts of the financial guarantees that the plaintiffs allege Trump made, he would still have retained adequate resources to contribute the $75 million as well as to advance the $25 million loan to the Taj Mahal. The consolidated complaint, however, counters that this $500,000,000 estimate is an exaggerated representation of Trump's personal fortune because it was "based upon artificially inflated appraisals ... [and was] not prepared in accordance with generally accepted accounting principles." Complaint at p 34. We cannot, however, assume this allegation to be true--as is the normal practice under Rule 12(b)(6)--because it is insufficiently specific to satisfy Rule 9(b), which, as we have explained above, see supra note 17, applies at least to the claims brought under § 10 and Rule 10b-5. The complaint wholly fails to allege the established accounting practices that the defendants supposedly departed from and the manner in which they supposedly did so. As we mentioned in our discussion of the allegations concerning the AGI Report, see supra note 17, under Christidis these defects in a complaint render the fraud allegations insufficiently exact to meet the requirements of Rule 9(b). See Christidis, 717 F.2d at 100
 
 
 [20]
 The prospectus specified how the Partnership planned to finance the $805 million: $675 million from the sale of the bonds; $75 million from Trump's capital contribution; and $55 million from other sources, including earnings from the investment of the yet unused portion of the bond proceeds and the $25 million Trump was obliged to lend the venture under certain circumstances
 
 
 [21]
 With respect to the same topic, the plaintiffs additionally submit that the prospectus did not disclose that the Taj Mahal would have to expend substantial resources to lure patrons to the Taj Mahal and away from competitors, which expenditures would detract from the profits the Taj Mahal could reap from the new customers. This allegation is without merit. The prospectus does in fact describe the marketing strategy which the Partnership planned to utilize to attract customers to the casino. For example, the prospectus reported that the Partnership would promote the Taj Mahal through the use of advertising, complimentary services and promotional programs. In conjunction with the statements concerning the intensity of inter-casino competition, see supra at 370-71; infra at 376-77, these disclosures sufficed to inform a reasonable investor that the Taj Mahal would need to spend substantial sums in its efforts to attract patrons from its competitors
 The plaintiffs also invoke the following statement from the prospectus:
 The Partnership believes that the opening of the Taj Mahal [in] the proximity of the Showboat and Resorts Casino Hotel will attract an increased volume of patrons to the vicinity of the Taj Mahal.
 Complaint at p 38 (citing Prospectus at 34). It is unclear whether the plaintiffs found an allegation on this statement. In case they wished to allege that this statement is affirmatively and materially misleading because it fails to adjust the increased casino win for increased advertising and promotional expenditures, we note that the prospectus only states that the Taj Mahal's close proximity to other casinos will result in a larger number of customers in the vicinity of the Taj Mahal, not that it will result in greater profits for the Taj Mahal itself. Hence it does not advance the plaintiffs' position.