**Naomi O. HARDEN, Antonia Mucci, Concetta Mucci, Ward O. Hughes, Jr., and Evelyn M. Hughes, for themselves and on behalf of all other similarly situated noteholders of Firstmark Corporation, Plaintiffs–Appellees,**

v.

**RAFFENSPERGER, HUGHES & CO., INC., Defendant–Appellant.**

No. 94–2892.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 5, 1994.*

Decided Sept. 15, 1995.

Rehearing Denied Oct. 17, 1995.

---

* Following oral argument, the court invited the Securities Exchange Commission to submit an amicus brief on the issue whether "qualified independent underwriters" are subject to underwriters' liability under § 11 of the Securities Act.

1394

Antonia Mucci, Concetta Mucci, Evelyn M. Hughes.

Roger L. Taylor (argued), Thomas E. Dutton, James W. Rankin, Kirkland & Ellis, Chicago, IL, Anne H. Weinheimer, Indianapolis, IN, for Raffensperger, Hughes & Company, Incorporated.

Jacob H. Stillman, Securities & Exchange Commission, Office of the General Counsel, Washington, DC, for amicus curiae Securities and Exchange Commission.

Before BAUER, REAVLEY ** and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

This interlocutory appeal presents three certified questions from the district court. We must consider whether a person who acts as a "qualified independent underwriter" pursuant to the rules of the National Association of Securities Dealers ("NASD") is subject to underwriters' liability under section 11 of the Securities Act of 1933. The district court concluded that qualified independent underwriters are subject to section 11 liability and that appellant Raffensperger, Hughes & Co. ("Raffensperger") had not established a defense to such liability as a matter of law. We must also determine whether the "bespeaks caution" doctrine renders the alleged untrue statements and admissions from the registration statement immaterial as a matter of law. The district court was of the view that the statements could not be so characterized. It therefore denied Raffensperger's motion for summary judgment. For the reasons that follow, we affirm.

## I
## BACKGROUND

### A. *Facts*

Firstmark Corporation, a financial services company and member of the NASD, chose to issue $20 million in short term notes through

Gene R. Leeuw, Charleyne Gabriel (argued), Klineman, Rose & Wolf, Indianapolis, IN, for Naomi O. Harden, James G. Harden,

** The Honorable Thomas M. Reavley of the United States Court of Appeals for the Fifth Circuit is sitting by designation.

a subsidiary. NASD rules prohibited First-mark from using an affiliated company as its underwriter without first retaining an independent company known as a "qualified independent underwriter" to perform due diligence on the registration statement and to recommend a minimum yield. *See NASD Compliance Manual,* (CCH) ¶ 1882, Sch. E, § 3(c)(1) (1994).[1] Firstmark retained Raffensperger as its qualified independent underwriter. Raffensperger agreed to recommend the minimum yield rate on the First-mark notes and to assist in preparing the registration statement. In return, Raffensperger received approximately $80,000.

Firstmark's registration statement contained a statement that "[i]f [Firstmark's] plans to restore profitability to its day-to-day operations are not successful ... the Company's stockholder's equity will continue to erode." R.56, Ex. 1 at 8 [hereinafter, "plans to restore statement"]. In another statement, Firstmark said:

> The Company is seeking federal insurance ... through either the Federal Savings and Loan Insurance Corporation (FSLIC) or the Federal Deposit Insurance Corporation (FDIC).... The application with FHLB [Federal Home Loan Bank] has been placed in an inactive status pending the outcome of the application with FDIC. FDIC expects to conclude their field examination by September 30, 1986, and to render a decision on the application within 90 days thereafter. If the application with the FDIC is denied, the Company intends to reactivate the application with the FHLB....
>
> There is no assurance that either the FHLB application or the FDIC application will be approved[.]

*Id.* at 6 [hereinafter, "insurance statement"]. Raffensperger consulted officers and agents of Firstmark to verify these statements and the other information in the registration statement. At no time did Raffensperger agree to buy, sell, distribute, or solicit orders for the Firstmark notes. After Firstmark issued the notes, its insurance application was denied officially. The company subsequently declared bankruptcy before the notes were paid.

## B. *Earlier Proceedings*

Purchasers of the Firstmark notes filed a class action lawsuit against Raffensperger. They claimed that the registration statement contained material falsehoods and omitted material facts in violation of 15 U.S.C. § 77k(a)(5), which authorizes suits against statutory underwriters.[2] Raffensperger moved for summary judgment on the ground that it was not an "underwriter" because it neither offered, purchased, sold, nor distributed the Firstmark notes. Alternatively, it contended that it was not liable because it had exercised due diligence and had included sufficient cautionary language in the registration statement.

The district court denied Raffensperger's motion. The court determined first that qualified independent underwriters could be subject to underwriters' liability and second that genuine issues of material fact existed with respect to Raffensperger's defenses. The district court began its analysis by examining section 2(11) of the Securities Act, which, in pertinent part, defines an underwriter as "any person" who "participates or has direct or indirect participation in" the "distribution of any security." 15 U.S.C. § 77b(11). The district court noted that, although Raffensperger neither purchased, offered, nor sold the Firstmark notes, its services were essential to their distribution. The court then noted that, under section 5 of the Securities Act, 15 U.S.C. § 77e, defen-

---

1. At the time Firstmark issued its notes, Schedule E appeared at ¶ 1755 of the NASD Compliance Manual. *See NASD Compliance Manual,* (CCH) ¶ 1755 (1986). Although the two relevant sections of the Manual have been amended since 1986, the amendments do not affect materially the disposition of this appeal. *See infra* note 4. Accordingly, we have cited to the current version of the Manual for the benefit of the bar.

2. The statute provides, in pertinent part, that:
   In case any part of the registration statement ... contained an untrue statement of material fact or omitted to state a material fact ... any person acquiring such security ... may, either at law or in equity, ... sue ...
   (5) every underwriter with respect to such security.
   15 U.S.C. § 77k(a)(5).

dants may be liable under the doctrine of "participant liability" if they were a "necessary participant" and "substantial factor" in the offer or sale of unregistered securities. R.668 at 6–8. The court applied case law analyzing section 5 because, it reasoned, both section 5 and section 11 "hinge on the definition and scope of the term 'participation' and the phrase 'direct or indirect.'" R.668 at 7. In the district court's view, both section 2(11) and the decisions interpreting section 5 make clear that "participation" should be construed broadly to encompass actions beyond financial participation. The court then reasoned that, because Raffensperger's actions were "necessary to and a substantial factor in" the distribution of the Firstmark notes, Raffensperger "participated," at least indirectly, in their distribution. R.668 at 11–12. Therefore, the court concluded, Raffensperger could be subject to section 11 liability. Next, the court determined that Raffensperger was not excused from liability under 15 U.S.C. § 77k(e), which limits an underwriter's exposure to the total price "at which securities underwritten by him and distributed to the public were offered to the public." The court reasoned that Raffensperger had "underwritten" all the Firstmark notes in the sense of the statutory definition. Finally, the district court rejected Raffensperger's other defenses. The court determined that genuine issues of material fact existed with respect to Raffensperger's due diligence claim. The court also rejected Raffensperger's claim that it was entitled to summary judgment under the "bespeaks caution" doctrine. Under this rule, misstatements or omissions in a registration statement that involve "soft information," such as subjective predictions, may become immaterial in light of accompanying words of caution or warning. Assuming that the doctrine applied, the district court held that Raffensperger had not shown that the statements and omissions at issue contained "soft information" rather than hard facts.

Following the district court's decision, Raffensperger moved to certify the case for interlocutory appeal. On May 13, 1994, the district court entered an order amending its previous order denying Raffensperger's motion for summary judgment. The May order stated that the court's summary judgment decision involved "controlling questions of law as to which there is substantial ground for difference of opinion" and that "[a]n immediate appeal from this Order may materially advance the ultimate termination of this litigation." R.689 at 1. The court then certified three questions for our review.[3]

## II
## DISCUSSION

■ We have jurisdiction over the three issues certified by the district court pursuant to 28 U.S.C. § 1292(b). We review the district court's decision to deny Raffensperger summary judgment de novo. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All facts are viewed in the light most favorable to the nonmoving party—here the plaintiff class. *Ryan v. Wersi Elec. GmbH & Co.*, 3 F.3d 174, 179 (7th Cir.1993); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873,

---

3. The questions are:

   1. Whether an NASD "qualified independent underwriter"—a party retained solely to make minimum interest rate recommendations and participate in the preparation of a registration statement but which does not purchase or sell securities, solicit orders, take part in the actual distribution, assume any risk of sale of the securities or do other things commonly associated with an underwriter's role—is nevertheless am [sic] "underwriter" as defined in Section 2(11) of the Securities Act of 1933;
   2. Whether—even if considered an "underwriter" as defined by 2(11)—an NASD "qualified independent underwriter" which only makes interest recommendations and participates in the preparation of the registration

statement nonetheless can avail itself of the damage limitation of Section 11(e) of the Act which provides that no underwriter shall be liable for damages in excess of the total price at which the securities underwritten by him and distributed to the public and distributed to the public [sic]; and
   3. Whether, under the "bespeaks caution" doctrine set forth in *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d [sic] 357, 364 ([3d] Cir.1993), *petition for cert. filed*, 62 U.S.L.W. 3511 (Jan. 12, 1994), the alleged untrue statements in and alleged omissions from the registration statement are immaterial as a matter of law as a result of the accompanying statements of caution or warning.

R. 689 at 2–3.

876 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). As the moving party, Raffensperger must establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Harrison*, 974 F.2d at 876. Raffensperger's arguments fall into two categories: (1) it is not subject to section 11 liability because it was not an underwriter; (2) it was insulated from liability by either 15 U.S.C. § 77k(e)'s limitation on underwriters' liability or the "bespeaks caution" doctrine. We consider each of these main contentions in turn.

### A. *The Scope of Section 11*

We turn first to whether Raffensperger was subject to section 11 liability when it acted as a "qualified independent underwriter" in the distribution of the Firstmark notes. Raffensperger submits that it cannot be subject to section 11 liability because its actions fell outside the scope of section 2(11)'s definition of "underwriter." Raffensperger notes that section 2(11) provides that an underwriter includes any person who "participates" or has "direct or indirect participation in" the purchase, offer, or sale of securities in connection with their distribution. Raffensperger then notes that it is undisputed that it had not purchased, sold, or offered the Firstmark notes for sale. Consequently, it concludes, it was not an underwriter. The plaintiffs respond that section 2(11)'s definition of underwriter must include more than purchasers, sellers, and distributors of securities—otherwise much of the definition would be superfluous. *Cf. infra* p. 1400 (reproducing statutory definition). They also note that the SEC specifically approved of the NASD rule that requires "qualified independent underwriters" to accept section 11 liability and further submit that Raffensperger recognized its exposure because it specifically contracted to limit its section 11 liability.

### 1.

■ Before we turn to the relevant provisions of the 1933 Securities Act, we briefly discuss the nature of the NASD and outline its rules relating to the use and role of qualified independent underwriters. The National Association of Securities Dealers was created under the auspices of Section 15A, 15 U.S.C. § 78o–3(a)–(i), of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* Section 15A authorizes the creation of "national securities association[s]" to be registered with the SEC. 15 U.S.C. § 78o–3(a). To obtain such registration, an association must satisfy a series of requirements. *See* 15 U.S.C.§ 78o–3(b). In particular, the association must develop a set of rules designed to prevent fraudulent practices and to protect the investing public. 15 U.S.C. § 78o–3(b)(6). The association also must establish disciplinary procedures to deal with members who violate its rules. *See* 15 U.S.C. § 78o–3(b)(7)–(8). The SEC may review the association's disciplinary decisions. 15 U.S.C. § 78o–3(h)(3). Moreover, pursuant to section 19 of the Securities Exchange Act, the SEC possesses the authority to approve, abrogate, and amend the rules of self-regulatory organizations such as the NASD. *See* 15 U.S.C. § 78s(b)–(c).

The NASD has issued rules requiring its members to meet one of three criteria before they may underwrite, participate as a member of an underwriting syndicate, or otherwise assist in the distribution of a public offering of debt or equity securities issued by themselves or an affiliate. *See NASD Compliance Manual*, (CCH) ¶ 1882, Sch. E, § 3(a)–(c) (1994). Only the first criterion is relevant in this case. In relevant part, it requires that "the yield at which a debt issue is to be distributed to the public [be] established at a ... yield no lower than that recommended by a qualified independent underwriter which shall also participate in the preparation of the registration statement and the prospectus, offering circular, or similar document and which shall exercise the usual standards of 'due diligence' in respect thereto[.]" *Id.* § 3(c)(1). The NASD rules set forth detailed requirements for members who intend to act as a qualified independent underwriter. The rules establish minimal practice, experience, and operational requirements for the member, as well as minimal experience and propriety requirements for the member's principal officials. *See id.* § 2(*o*)(1)–(5). They dictate that the qualified

independent underwriter be unaffiliated with the member issuing securities pursuant to section 3 of Schedule E. *Id.* § 2(*o*)(6). The rules also state that the qualified independent underwriter agrees "to undertake the legal responsibilities and liabilities of an underwriter under the Securities Act of 1933, specifically including those inherent in Section 11 thereof." *Id.* § 2(*o*)(7).[4] A footnote to the definitional section further provides:

4. In addition to the footnote, n.*, which we discuss later in the text, the current *NASD Compliance Manual* defines "qualified independent underwriter" as an NASD member that:

(1) is actively engaged in the investment banking or securities business and which has been so engaged, in its present form or through predecessor broker/dealer entities, for at least five years immediately preceding the filing of the registration statement;

(2) in at least three of the five years immediately preceding the filing of the registration statement has had net income from operations of the broker/dealer entity or from the pro forma combined operations of predecessor broker/dealer entities, exclusive of extraordinary items, as computed in accordance with generally accepted accounting principles;

(3) as of the date of the filing of the registration statement and as of the effective date of the offering:

a. if a corporation, a majority of its board of directors or, if a partnership, a majority of its general partners, are persons who have been actively engaged in the investment banking or securities business for the five-year period immediately preceding the filing of the registration statement;

b. if a sole proprietorship, the proprietor has been actively engaged in the investment banking or securities business for the five-year period immediately preceding the filing of the registration statement;

(4) has actively engaged in the underwriting of public offerings of securities of a similar size and type for at least the five-year period immediately preceding the filing of the registration statement. For purposes of this section, the above requirement shall be satisfied if the member:

(a) with respect to a proposed debt offering, has acted as manager or co-manager of public offerings of debt securities within the previous five years, including offerings each with gross proceeds of not less than 25% of the anticipated gross proceeds of the proposed offering,

(b) with respect to a proposed equity offering, has acted as manager or co-manager of public offerings of equity securities (or of securities convertible into equity securities) within the previous five years, including offerings each with gross proceeds of not less than 50% of the anticipated gross proceeds of the proposed offering, or

(c) has acted as manager or co-manager of public offerings of securities within the previous five years, including offerings each with gross proceeds of not less than $50 million, or

(d) demonstrates that it has acquired experience within the previous five years involving the pricing and due diligence functions comparable to that of a manager or co-manager of public offerings of securities in the above amounts;

(5) no person associated with the member in a supervisory capacity responsible for organizing, structuring or performing due diligence with respect to corporate public offerings of securities:

(a) has been convicted within five years prior to the filing of the registration statement of a violation of the anti-fraud provisions of the federal or state securities laws, or any rules or regulations promulgated thereunder, in connection with the distribution or a registered or unregistered offering of securities;

(b) is subject to any order, judgment, or decree of any court of competent jurisdiction entered within five years prior to the filing of the registration statement permanently enjoining or restraining such person from engaging in or continuing any conduct or practice in violation of the anti-fraud provisions of the federal or state securities laws, or any rules or regulations promulgated thereunder in connection with the distribution of a registered or unregistered offering of securities; or

(c) has been suspended or barred from association with any member by an order or decision of the Securities and Exchange Commission, any state, the Corporation or any other self-regulatory organization within five years prior to the filing of the registration statement for any conduct or practice in violation of the anti-fraud provisions of the federal or state securities laws, or any rules, or regulations promulgated thereunder, or the anti-fraud rules of any self-regulatory organization in connection with the distribution of a registered or unregistered offering of securities; or [sic]

(6) is not an affiliate of the entity issuing securities pursuant to Section 3 of this Schedule and does not beneficially own five percent or more of the outstanding voting securities, common equity, preferred equity or subordinated debt of such entity which is a corporation or beneficially own a partnership interest in five percent or more of the distributable profits or losses of such entity which is a partnership; and

(7) has agreed in acting as a qualified independent underwriter to undertake the legal responsibilities and liabilities of an underwriter under the Securities Act of 1933, specifically including those inherent in section 11 thereof.

In the opinion of the National Association of Securities Dealers, Inc. and the Securities Exchange Commission the full responsibilities and liabilities of an underwriter under the Securities Act of 1933 attach to a "qualified independent underwriter" performing the functions called for by the provisions of Section 3 hereof.

*Id.* § 2(*o*)n.*.

Schedule E was adopted in 1972, after various brokers and dealers had begun raising capital by offering their own securities to the public. *See* 46 Fed.Reg. 43,457, 43,457 (1981) (discussing origins of NASD and then-comparable SEC rule). The original version contained the footnote, but not the language currently appearing in section 2(*o*)(7). In commenting on the footnote, the NASD stated that the SEC

> has expressed the view that the most important factor involved in its authorization of self-underwritings by members is that the responsibilities and liabilities of underwriters under the Securities Act attach to qualified independent underwriters. It believes, as does the Association, that legally such responsibilities and liabilities do attach. It recognizes, however, that the question has never been adjudicated. Therefore, it has required the referred to footnote as a condition for not disapproving the Association's proposals.

R.578, Ex.D at 2, *Public Distribution of Issues of Members' Securities and of Affiliates Thereof*, NASD Notice to Members (1972). Later that year, the language in section 2(*o*)(7) was added as an amendment. The NASD, in discussing the proposed amendment that became section 2(*o*)(7) of Schedule E, stated

> [The SEC] has directed ... that the Association should institute steps directed toward amending Schedule E to specifically require, should there be any doubt as to the legal attachment of [section 11] responsibilities and liabilities, that qualified independent underwriters specifically undertake those responsibilities and liabilities. The proposed amendment which is stated

below is, therefore, being submitted at this time for comment by members and interested persons. It is the Association's understanding that a comparable provision will be contained in the rule which will be subsequently proposed by the Commission in connection with SECO broker-dealer distributions. The Commission believes that the public interest will not adequately be protected without this provision.

R.578, Ex.D at 8, *Public Distribution of Issues of Members' Securities and of Affiliates Thereof*, NASD Notice to Members (1972); *see also* 37 Fed.Reg. 26,294, 26,295 n.7 (1972) (detailing SEC's explanation that NASD had amended its rules to require qualified independent underwriters to be subject to section 11 liability).

Raffensperger is a member of the NASD and therefore is subject to the NASD rules discussed above. It is undisputed that Raffensperger acted as the "qualified independent underwriter" with respect to the Firstmark notes. We must now consider whether Raffensperger's actions subjected it to liability under the Securities Act.

### 2.

■ Our analysis of whether Raffensperger was subject to underwriters' liability under the Securities Act begins with the text of the statute itself. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985); *see also Central Bank of Denver v. First Interstate Bank of Denver*, —— U.S. ——, —— – ——, 114 S.Ct. 1439, 1446–47, 128 L.Ed.2d 119 (1994). The Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, regulates initial distributions of securities. The 1933 Act, along with the Securities Exchange Act of 1934, embraces " 'a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of caveat emptor.' " *Central Bank of Denver*, —— U.S. at ——, 114 S.Ct. at 1445 (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972)). Section 11 of the Securities Act creates an express cause of action against a

---

The NASD's original definition of qualified independent underwriter did not contain subsection 5 and also did not contain subdivisions (a),

(b), and (c) under subsection 4 of the current definition. *See, e.g., NASD Compliance Manual*, (CCH) ¶ 1755, Sch. E, § 2(k) (1986).

series of individuals for material misstatements in or omissions of material fact from a registration statement. 15 U.S.C. § 77k(a); *see also* 15 U.S.C. § 77g (identifying information required to be in registration statement). Among those who may be liable under section 11 are underwriters. *See* 15 U.S.C. § 77k(a)(5). Specifically, section 11(a) provides that

> [i]n case any part of the registration statement, when such part became effective, contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may, either at law or in equity, in any court of competent jurisdiction, sue ... every underwriter with respect to such security.

15 U.S.C. § 77k(a)(5). The Securities Act, in section 2(11), defines an "underwriter" as

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph, the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C. § 77b(11).

Applying section 2(11)'s definition of underwriter to the facts at hand, we note that the parties agree that Raffensperger neither purchased Firstmark notes with a view to distribute them, nor offered or sold notes in connection with their distribution. Thus, we must determine whether Raffensperger's actions as a qualified independent underwriter caused it either to "participate in," to have "direct or indirect participation in," or to have a "participation in the direct or indirect underwriting of," (1) the purchase of the Firstmark notes with a view to distribution, or (2) the offer or sale of the notes in connection with their distribution.

■ Both the Supreme Court and this court have interpreted broadly the phrases "participate in" and "participation" found in 15 U.S.C. § 77b(11). In *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), for example, the Supreme Court discussed whether the Congress intended to impose liability under section 12(1) of the Securities Act on those collateral to the offer or sale of a security. Rejecting the possibility, the Court commented, in dictum, that "Congress knew of the collateral participation concept and employed it in the Securities Act.... Liabilities and obligations expressly grounded in participation are found elsewhere in the Act, *see, e.g.,* 15 U.S.C. § 77b(11)." *Dahl,* 486 U.S. at 650 n. 26, 108 S.Ct. at 2080 n. 26. The Court's footnoted discussion makes clear that, in its view, one who "participates," or "takes part in," an underwriting is subject to section 11 liability. Similarly, in *SEC v. Van Horn,* 371 F.2d 181 (7th Cir.1966), we commented, in interpreting whether an individual was entitled to an exemption from section 5 liability, *see* 15 U.S.C. § 77e, that "the statutory definition [of underwriter, contained in section 2(11) ] specifically covers every person who participates in a distribution of securities." 371 F.2d at 188 (citing *SEC v. Culpepper,* 270 F.2d 241 (2d Cir.1959); *SEC v. Chinese Consol. Benev. Ass'n,* 120 F.2d 738 (2d Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941)). We subsequently noted that *Van Horn* "suggests that the term 'underwriter' is broad enough to encompass all persons who engage in steps necessary to the distribution of securities." *SEC v. Holschuh,* 694 F.2d 130, 139 n. 13 (7th Cir.1982) (considering section 5 liability, but declining to rule on scope of section 2(11)). Other courts have interpreted section 2(11) in similar fashion.[5]

---

5. *See, e.g., SEC v. International Chem. Dev. Corp.,* 469 F.2d 20, 33 (10th Cir.1972); *In re Activision Sec. Litig.,* 621 F.Supp. 415, 424 (N.D.Cal.1985) (citing *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 536 (S.D.N.Y.1977)).

Under this view of the statutory definition, it is clear that Raffensperger would qualify as an underwriter in this case. Its role as qualified independent underwriter was "necessary to the distribution of [the Firstmark] securities." *Cf. Holschuh*, 694 F.2d at 139 n. 13.

There are, moreover, additional and substantial reasons for interpreting section 2(11) in a manner that includes "qualified independent underwriters" within the statutory definition. Most significantly, the NASD, as we noted above, has determined that "qualified independent underwriters" are subject to section 11 liability. *See NASD Compliance Manual*, (CCH) ¶ 1882, Sch. E, § 2(*o*)(7) & n.* (1994). The footnote to the relevant provision in the *NASD Compliance Manual* indicates that the SEC agrees with the NASD's view on qualified independent underwriters' liability. Indeed, the SEC has possessed the authority to approve, abrogate, and amend the NASD rule, but has refrained from doing so. *See* 15 U.S.C. § 78s(b)–(c). Moreover, an existing SEC regulation interpreting section 2(11) provides:

> The terms *offers, participates*, or *participation* in section 2(11) of the Act shall not be deemed to apply to the publication or distribution of information, opinions or recommendations with respect to the securities of a registrant which is required to file reports pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934, and proposes to file, has filed or has an effective registration statement under the Securities Act of 1933 if—[two delineated requirements are satisfied].

17 C.F.R. § 230.137. By providing that, in certain circumstances, the terms "participates" and "participation" will not include the issuance of an opinion or recommendation,

this regulation suggests implicitly that such actions could otherwise constitute "participation." In turn, the regulation indicates that similar activities performed by "qualified independent underwriters" could be sufficient to subject them to section 11 liability.[6]

In response, Raffensperger argues that the NASD's position is entitled to no deference because it was not subjected to the rulemaking procedures required by the Administrative Procedure Act, 5 U.S.C. §§ 553, 556. We note that the rule was subject to review and comment by NASD members and other interested persons. *See* R. 578, Ex.D at 8, *Public Distribution of Issues of Members' Securities and of Affiliates Thereof*, NASD Notice to Members (1972). In any event, however, it is significant that the SEC, the agency responsible for enforcing the securities laws, and the NASD, the only national securities association, both agree that qualified independent underwriters, themselves a creation of the NASD, are subject to section 11 liability. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (noting in case where agency interpretations were expressed in interpretive rules, informal rulings, and an amicus curiae brief, that "[t]he weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"); *see also EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (citing *General Elec. Co. v. Gilbert*, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976)).

The SEC's approval of the NASD's determination that qualified independent under-

---

**6.** *See also Opinion of General Counsel relating to Rule 142*, Sec. Act. Release No. 1862 (Dec. 14, 1938), 1 Fed.Sec.L.Rep. (CCH) ¶ 1531, at 2303–5 (stating that the terms "participates" and "participation" include any person "enjoying substantial relationships with the issuer or underwriter, or engaged in the performance of any substantial functions in the organization or management of the distribution"). *But cf.* 17 C.F.R. § 230.142 ("The terms *participates* and *participation* in section 2(11) ... shall not include the interest of a person (1) who is not in privity of

contract with the issuer nor directly or indirectly controlling, controlled by, or under common control with, the issuer, and (2) who has no association with any principal underwriter of the securities being distributed, and (3) whose function in the distribution is confined to an undertaking to purchase all or some specified portion of the securities remaining unsold after the lapse of some specified period of time, and (4) who purchases such securities for investment and not with a view to distribution.").

writers are subject to the strictures of section 11 is not surprising given the history of SEC and NASD regulation of qualified independent underwriters. Our earlier discussion has set forth the history and development of the NASD's rule on affiliated underwriting. At about the same time the NASD fashioned its rule, the SEC developed similar guidelines for broker-dealers who were not subject to the NASD provisions. The SEC's rule was codified at 17 C.F.R. § 240.15b10–9 ("Rule 15b10–9"), and applied to brokers or dealers who were registered only with the SEC ("SECO broker-dealers"). This SEC rule was rescinded in 1984 after Congress amended the Securities Exchange Act to eliminate the option of SEC-only registration, Pub.L. No. 98–38, § 3(a), 97 Stat. 205 (1983). *See* 15 U.S.C. § 78o(b)(8)–(9). Following the congressional amendments, SECO broker-dealers, with exceptions not relevant here, were required to register with the NASD. *See id.* § 78o(b)(8).

Notably, Rule 15b10–9 forbade a SECO broker-dealer from underwriting or otherwise participating in a public offering of its own securities, or those of an affiliate, unless it first satisfied several criteria. Among these requirements was a provision mandating, in pertinent part, that

> [t]he price at which the issue is to be distributed to the public [be] no higher than that recommended jointly by two qualified independent underwriters who shall each also participate in the preparation of the registration statement and the

prospectus, offering circular or other comparable document; shall each exercise the usual standards of due diligence in respect thereto; and shall each otherwise agree to undertake the *full legal responsibilities and liabilities of an underwriter under the Securities Act of 1933.*

17 C.F.R. § 240.15b10–9(a) (1983) (emphasis added); *see also* 37 Fed.Reg. 26,294, 26,297 (1972) (adopting regulation). The SEC's definition of "qualified independent underwriter," 17 C.F.R. § 240.15b10–9(e)(7), was essentially identical to the definition in the *NASD Compliance Manual.*[7] In adopting Rule 15b10–9, the SEC noted explicitly that the NASD had altered its rule allowing affiliated underwriting to require the qualified independent underwriter to accept section 11 liability. *See* 37 Fed.Reg. 26,294, 26,295 n. 7 (1972). The SEC also explained that the qualified independent underwriter

> carr[ies] out the responsibilities of a usual underwriter in evaluating the terms of the offering and thus serve[s] to protect the investing public at least partially from the lack of arm's-length bargaining present in such situations. Accordingly, the rule provides that these underwriters must undertake to assume the full legal responsibilities of an underwriter under the Securities Act of 1933.

*Id.* at 26,295; *see also* 47 Fed.Reg. 1372, 1372 (1982) (noting that qualified independent underwriters help avoid conflicts of interest inherent in affiliated underwriting transactions and aid in maintaining some semblance

---

7. The term "qualified independent underwriter" shall mean a broker or dealer which:

(i) Has been actively engaged in the investment banking business or securities business for at least 5 years immediately preceding the filing of the registration statement;

(ii) In at least 3 of the 5 years immediately preceding the filing of the registration statement has had a profit from its operations;

(iii) As of the date of the filing of the registration statement and as of the date of the offering:

(a) If a corporation, has a majority on its board of directors of persons who have been actively engaged in the investment banking or securities business for the 5-year period immediately preceding the filing of the registration statement;

(b) If a partnership, the majority of its general partners has been actively engaged in

the investment banking or securities business for the 5-year period immediately preceding the filing of the registration statement;

(c) If a sole proprietorship, the proprietor has been actively engaged in the investment banking or securities business for the 5-year period immediately preceding the filing of the registration statement.

(iv) Has actively engaged in the underwriting of public offerings of securities for at least the 5-year period immediately preceding the filing of the registration statement; and

(v) Is not an affiliate of the non-member broker or dealer and/or affiliated issuer.

17 C.F.R. § 240.15b10–9(e)(7) (1983); *see also* 37 Fed.Reg. 26,294, 26,298 (1972). *Compare supra* note 4 (reproducing NASD definition of qualified independent underwriter).

of arm's length bargaining between underwriters and issuers) (citing 37 Fed.Reg. 7709 (1972)). Thus, the SEC made clear that qualified independent underwriters were needed to ensure that the protective functions performed by underwriters at the time Congress enacted the Securities Act of 1933 also were performed in affiliated underwriting transactions—transactions unknown to the 1933 Congress. *See also* 46 Fed.Reg. 43,457, 43,457 (1981) (noting that the NASD and SEC's self-underwriting rules "were promulgated when a number of brokers and dealers first began to raise capital by offering their own securities to the public").

When the SEC rescinded Rule 15b10–9 following the 1983 amendments to the Securities Exchange Act, it indicated that the Rule no longer was necessary because SECO brokers and dealers, with exceptions not relevant here, now would be registering with the NASD. *See, e.g.,* 48 Fed.Reg. 53,688, 53,688 (1983); *see also* Amicus Br. at 8 n. 9 (noting that Rule 15b10–9 became "obsolete" after Congress required SECO broker-dealers to join the NASD). Consequently, the SEC is aware of, has approved, and indeed expressly agrees with the NASD's interpretation of 15 U.S.C. § 77b(11). Indeed, the SEC already has interpreted this statutory provision, albeit in a now-rescinded regulation, as encompassing the activity of qualified independent underwriters.

In response to the significant judicial and administrative interpretations of section 2(11) discussed above, Raffensperger submits that any interpretation of section 2(11) that includes qualified independent underwriters would be inconsistent with congressional intent. According to Raffensperger's view, the 1933 Congress envisioned that such liability would attach only to those who had a financial stake in the transaction.

We cannot accept this narrow reading of the text and structure of the statute and the resulting rigid characterization of the intent of Congress. The qualified independent underwriter appeared on the scene of the securities industry in response to a development in securities issuance that was not known at the time of the passage of the Act. *See, e.g.,* 46 Fed.Reg. 43,457, 43,457 (1981) (noting that affiliated underwriting first came into vogue in the early 1970s). Although Congress was not confronted directly with affiliated underwriting, it clearly envisioned the existence of the SEC and NASD and knew that the public agency and private organization would act to apply the policies of the Act to contemporary business arrangements within the securities industry. Accordingly, the SEC and NASD have authorized affiliated underwriting transactions as long as the issuer employs the services of the "qualified independent underwriter." As the SEC explained in its discussion of Rule 15b10–9, the qualified independent underwriter fulfills a role that was very important in the eyes of the 1933 Congress—protection of the investing public. Self or affiliated underwritings, absent an independent intermediary, would tend to erode such protection. An issuer may have incentives to mislead investors, abscond with their funds, and leave behind a judgment-proof shell. Recognizing this possibility, the NASD and SEC allowed for affiliated underwriting, such as that undertaken by Firstmark in this case, but required that a qualified independent underwriter participate in the transaction. The qualified independent underwriter thus performs the same protective function envisioned by the 1933 Congress when it defined, in section 2(11), those entities who would be subject to section 11 liability. Indeed, the qualified independent underwriter "participates" in the issues through its voluntary and explicit assumption of the liability usually assumed by the underwriter. That assumption of liability is an important factor in maintaining investor confidence. Accordingly, we hold that Raffensperger was subject to section 11 liability because it acted as Firstmark's qualified independent underwriter.

### B. *Raffensperger's Defenses*

■ Absent some defense, an underwriter is liable for all material misstatements and omissions in the registration statement. *See* 15 U.S.C. § 77k(a)(5). Raffensperger raises two defenses to such liability. Raffensperger claims that it is free from liability pursuant to section 11(e) of the Securities Act, 15 U.S.C. § 77k(e), which limits an underwriter's liability to the securities "underwritten

by him and distributed to the public[.]" Because it did not "underwrite" any of the Firstmark notes, Raffensperger submits, section 11(e) dictates that its liability be zero. Raffensperger contends, in the alternative, that the "bespeaks caution" doctrine insulates it from any liability. Raffensperger submits that the alleged misstatements and omissions in the registration statement consist of subjective, or "soft," information whose materiality was negated by cautionary language Raffensperger included in the registration statement. We address each of these arguments in turn.

### 1.

■ We cannot accept Raffensperger's argument that its liability must be limited to zero pursuant to 15 U.S.C. § 77k(e). There is no dispute that Raffensperger acted as "qualified independent underwriter" with respect to all the Firstmark notes. Accordingly, Raffensperger performed the protective function envisioned by the 1933 Congress with respect to the entire Firstmark distribution. In essence, then, all the Firstmark notes were "underwritten by [Raffensperger]." *See* 15 U.S.C. § 77k(e). Accordingly, Raffensperger incurred section 11 liability with respect to the entire distribution.

### 2.

#### a.

■ We now turn to Raffensperger's argument that it is insulated from liability under the "bespeaks caution" doctrine. The bespeaks caution doctrine provides that "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading. The substantial disclosure of specific risks may render alleged misrepresentations concerning soft information immaterial and thus nonactionable as securities fraud." 3B Harold S. Bloomenthal, *Securities and Federal Corporate Law* § 8.26[1] at 8–110 (1995); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994) ("The bespeaks caution

doctrine provides a mechanism by which a court can rule as a matter of law ... that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant[s] against claims of securities fraud.") (quotation and citation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 277, —— L.Ed.2d —— (1995); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir.1993) ("[T]he inclusion of sufficient cautionary statements in a prospectus renders misrepresentations and omissions contained therein nonactionable."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

Courts apply this narrow fact-intensive defense on a case-by-case basis,[8] inquiring

> whether, under all the circumstances, the omitted fact or the prediction without a reasonable basis "is one [that] a reasonable investor would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." Inclusion of cautionary language—along with disclosure of any firm-specific adverse facts or assumptions—is, of course, relevant to the materiality inquiry, for such inclusion or disclosure is part of the "total mix of information." Nevertheless, cautionary language as such is not per se dispositive of this inquiry.

*Rubinstein v. Collins,* 20 F.3d 160, 168 (5th Cir.1994) (internal footnotes, quotations and citations omitted). "[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *In re Trump,* 7 F.3d at 371. The cautionary language "must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* at 371–72.

Properly understood, this approach to assessing the capacity of a registration statement to mislead is simply a new name for an old concept. As our colleagues in the other circuits have noted, "the doctrine, when properly construed, merely represents the pragmatic application of two fundamental con-

---

**8.** *See, e.g., Rubinstein v. Collins,* 20 F.3d 160, 167–68 (5th Cir.1994); *In re Trump,* 7 F.3d at 371; *Mayer v. Mylod,* 988 F.2d 635, 638–40 (6th Cir.1993).

cepts in the law of securities fraud: materiality and reliance." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1414; *see also Rubinstein*, 20 F.3d at 167 ("[T]he 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context."). Several of the circuits have adopted explicitly some form of the doctrine,[9] and the principle appears consistent with the Supreme Court's statement in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)—a case addressing section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), that considered the issue of materiality as applied to "soft information" without commenting explicitly on the bespeaks caution doctrine—that,

> [w]hile a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil.... [P]ublishing accurate facts ... can render a misleading proposition too unimportant to ground liability.

*Id.* at 1097, 111 S.Ct. at 2760.[10] We have not commented extensively upon the doctrine. In *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411 (7th Cir.1992), we declined, in a case brought under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, to hold that the defendants' forward-looking statements were immaterial as a matter of law "merely because they 'bespoke caution.'" *Id.* at 1417.[11]

**b.**

■ In the case before us today, we believe that it is very clear that the district court was on solid ground in rejecting this narrow defense. As the district court noted, Raffensperger raises the "bespeaks caution" defense with respect to an alleged misstatement and omission. Raffensperger's application of the defense to Firstmark's "plans to restore statement"—"[i]f [Firstmark's] plans to restore profitability to its day-to-day operations are not successful ... the Company's stockholder's equity will continue to erode"—rings hollow. Essentially, Raffensperger contends that the word "plans" used in this statement means "future efforts" rather than existing methods, ideas, or means of achieving some goal. We cannot agree. Raffensperger's assertion relies, at its core, upon ascribing a meaning to the word "plan" that simply does not comport with the common lexicon. *See, e.g., Webster's Third New International Dictionary* 1729–30 (1981) (defining "plan" as, among other things, "a method of achieving something," "a proposed undertaking or goal," and "to have in mind"). Contrary to Raffensperger's attempt to portray the "plans to restore statement" as containing solely "soft information," the statement constitutes a present assertion of fact, i.e., "plans" exist or are being formulated. The plaintiffs' claim alleges that, contrary to what the registration statement says, such plans did not exist and were not under consideration. *See, e.g.,* R. 544 at 12 ¶ 49 and 13 ¶ 52. The dispute over the existence or non-

**9.** *See, e.g., Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 400 (11th Cir.1995) (per curiam); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1414 (collecting cases); *Rubinstein*, 20 F.3d at 166–68; *In re Trump*, 7 F.3d at 371–73; *Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 949 F.2d 243, 245–46 (8th Cir.1991); *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1040–41 (6th Cir.1991), *modified by Mayer v. Mylod*, 988 F.2d 635, 638–40 (6th Cir.1993) (holding that *Sinay* erred in adopting a per se approach); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir.1991); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 (1st Cir.1991); *see also Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 218–19 (4th Cir.1994).

**10.** *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1415 (commenting upon consistency of

"bespeaks caution" and *Virginia Bankshares*); *In re Trump*, 7 F.3d at 372–73 & nn. 14–16 (same); *Mayer*, 988 F.2d at 639 (same).

**11.** We think that *Roots Partnership* is best read not as rejecting the bespeaks caution doctrine generally but as rejecting its application to the facts at hand. *See* 965 F.2d at 1417 n. 5; *see also Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 873 F.Supp. 111, 124 n. 19 (N.D.Ill.1995) (stating that *Roots Partnership* declined to apply the doctrine "in a particular situation"). We note that various courts have indicated that the bespeaks caution doctrine applies to both § 10(b) and § 11 claims. *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1415 n. 3 (collecting cases).

existence of these "plans" is not the type of "soft information" to which the bespeaks caution doctrine applies. As the plaintiffs state succinctly, "whether Firstmark actually had such plans in place was a 'hard fact.'" Appellee's Br. at 36.

██ Raffensperger's defense also fails with respect to the "insurance statement":

> The Company is seeking federal insurance ... through either the Federal Savings and Loan Insurance Corporation (FSLIC) or the Federal Deposit Insurance Corporation (FDIC).... The application with FHLB has been placed in an inactive status pending the outcome of the application with FDIC. FDIC expects to conclude their field examination by September 30, 1986, and to render a decision on the application within 90 days thereafter. If the application with the FDIC is denied, the Company intends to reactivate the application with the FHLB....
>
> There is no assurance that either the FHLB application or the FDIC application will be approved[.]

The plaintiffs submit that this statement implies that Firstmark's application for FDIC insurance had been made in good faith and that there was some possibility that it would be approved. *See, e.g.,* R. 544 at 20–25 ¶ 87; they do not argue that the statement implied that approval was guaranteed and concede that any opinion regarding approval could be subject to the bespeaks caution doctrine. Appellee's Br. at 36. The plaintiffs contend, however, that, although the insurance statement suggests that there is *some* possibility that the FDIC would approve the insurance application in question, Firstmark knew, prior to the issuance of the registration statement, that there was in fact no possibility of such approval and omitted to disclose this fact. The information that the plaintiffs focus upon thus does not concern subjective or "soft information," but rather "hard facts." The bespeaks caution doctrine does not, as a matter of law, offset the materiality of such information.[12]

Conclusion

For the foregoing reasons, the order of the district court at issue in this interlocutory appeal is affirmed. The case is remanded for further proceedings consistent with this opinion.

AFFIRMED and REMANDED for additional proceedings

---

12. We emphasize that our ruling should in no way be construed as indicating our view on the ultimate outcome of this case; that is a matter to be addressed in the district court. We also note that the parties have raised various issues not germane to the three specific questions before us in this interlocutory appeal. We, of course, decline to address those issues.